No. 24-40709

# In the United States Court of Appeals for the Fifth Circuit

———

DAVID ALLEN HAVERKAMP, ALSO KNOWN AS BOBBIE LEE HAVERKAMP,

*Plaintiff - Appellant,*

*v.*

DOCTOR LANNETTE LINTHICUM; OWEN MURRAY; CYNTHIA JUMPER; PHILLIP KEISER; JOHN BURRUSS; MICHELLE ERWIN; KRIS COONS; BRIAN EDWARDS; JULIA HILNER,

*Defendants - Appellees.*

———

On Appeal from the United States District Court for the Southern District of Texas

———

## APPELLEES' BRIEF

———

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

CAMERON FRASER
Assistant Solicitor General
Cameron.Fraser@oag.texas.gov

ERIC S. ABELS
Assistant Attorney General

*Counsel for Defendants-Appellees*

# Certificate of Interested Persons

No. 24-40709

## David Allen Haverkamp, also known as Bobbie Lee Haverkamp,

*Plaintiff-Appellant,*

*v.*

## Doctor Lannette Linthicum; Owen Murray; Cynthia Jumper; Phillip Keiser; John Burruss; Michelle Erwin; Kris Coons; Brian Edwards; Julia Hilner,

*Defendants-Appellees.*

Under Fifth Circuit Rule 28.2.1, Defendants-Appellees, as governmental parties, need not furnish a certificate of interested persons.

/s/ Cameron Fraser

CAMERON FRASER
*Counsel of Record for*
*Defendants-Appellees*

## Statement Regarding Oral Argument

This appeal raises important issues of federal jurisdiction in the context of a novel equal-protection theory: that transgender inmates seeking gender-reassignment surgery are similarly situated to cisgender female inmates seeking medically necessary reconstructive vaginoplasty. This claim, even if viable, cannot be brought against Defendants. Sovereign immunity bars this suit, no *Ex parte Young* exception applies, and Haverkamp lacks Article III standing in any event. Because of the novel and complex issues presented, oral argument would assist the Court.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ....................................................................i

Statement Regarding Oral Argument ..........................................................ii

Table of Authorities ......................................................................................iv

Introduction ................................................................................................... 1

Statement of Jurisdiction ............................................................................. 3

Issues Presented ........................................................................................... 3

Statement of the Case ................................................................................... 4

    I.   Factual Background ................................................................................. 4

        A.  Texas provides for the safety and medical care of inmates diagnosed with gender dysphoria. ........................................4

        B.  Haverkamp is a 78-year-old biological man who is serving two 45-year sentences for aggravated sexual assault. .................................6

        C.  Nearly 20 years after being sentenced, Haverkamp begins identifying as transgender and receiving oral estrogen as a treatment for gender dysphoria. ...........................................7

        D.  Haverkamp requests, but does not receive, gender-reassignment surgery. .........................................................8

    II.  Procedural History ................................................................................. 9

        A.  Haverkamp sues, alleging that the Constitution requires Texas to allow gender-reassignment surgery for inmates....................9

        B.  The district court rules that sovereign immunity bars Haverkamp's suit, and Haverkamp appeals......................................14

Summary of the Argument................................................................................ 15

Standard of Review ......................................................................................... 18

Argument.......................................................................................................... 19

    I.   Sovereign Immunity Bars Haverkamp's Suit. ......................................... 19

        A.  Haverkamp requests an improper remedy under *Ex parte Young.* ................................................................................ 21

        B.  Haverkamp sued improper defendants under *Ex Parte Young*............29

II.   Haverkamp Lacks Article III Standing. .................................................... 34

Conclusion ............................................................................................................ 37

Certificate of Service .......................................................................................... 37

Certificate of Compliance ................................................................................. 38

## Table of Authorities

Page(s)

**Cases:**

*Barr v. Am. Ass'n of Political Consultants, Inc*,
    591 U.S. 610 (2020) ............................................................................... 27

*Bell v. Wolfish*,
    441 U.S. 520 (1979) ............................................................................... 24

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) .......................................................... 16, 21

*City of Austin v. Paxton*,
    943 F.3d 993 (5th Cir. 2019) ........................................ 17, 18, 20, 29

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ......................................................................... 18, 35

*Clark v. Quiros*,
    No. 3:19-CV-575, 2024 WL 3552472 (D. Conn. July 26, 2024) ...................... 26

*Cordellioné v. Commissioner, Indiana Department of Correction*,
    No. 3:23-CV-135, 2024 WL 4333152 (S.D. Ind. Sept. 17, 2024) ...................... 26

*Davis v. Scherer*,
    468 U.S. 183 (1984) ............................................................................... 21

*In re Deepwater Horizon*,
    732 F.3d 326 (5th Cir. 2013) ............................................................... 35

*Delaughter v. Woodall*,
    909 F.3d 130 (5th Cir. 2018) ............................................................... 25

*Dent v. West Virginia*,
    129 U.S. 114 (1889) ............................................................................... 23

*Edmo v. Corizon, Inc.*,
    935 F.3d 757 (9th Cir. 2019) ............................................................... 26

*Edmo v. Corizon, Inc.*,
    949 F.3d 489 (9th Cir. 2020) ............................................................... 26

*Estelle v. Gamble,*
    429 U.S. 97 (1976) ........................................................................24
*Flores v. Pompeo,*
    936 F.3d 273 (5th Cir. 2019) ..................................... 18, 22
*Gibson v. Collier,*
    920 F.3d 212 (5th Cir. 2019) .....................................*passim*
*Gonzales v. Oregon,*
    546 U.S. 243 (2006) ....................................................... 23
*Gross v. GGNSC Southaven, L.L.C.,*
    817 F.3d 169 (5th Cir. 2016) ....................................... 31
*Hall v. GE Plastic Pac. PTE Ltd.,*
    327 F.3d 391 (5th Cir. 2003) ....................................... 33
*Haverkamp v. Linthicum,*
    6 F.4th 662 (5th Cir. 2021) (*Haverkamp I*) ...............*passim*
*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee,*
    456 U.S. 694 (1982) ............................................... 18, 34
*Williams ex rel J.E. v. Reeves,*
    954 F.3d 729 (5th Cir. 2020) ......................................30
*Kosilek v. Spencer,*
    774 F.3d 63 (1st Cir. 2014) ......................................... 21
*Kovac v. Wray,*
    109 F.4th 331 (5th Cir. 2024) ..................................... 31
*Larson v. Domestic & Foreign Com. Corp.,*
    337 U.S. 682 (1949) ..................................................... 19
*Miles v. Rich,*
    576 F. App'x 394 (5th Cir. 2014) ..............................25-26
*Morris v. Livingston,*
    739 F.3d 740 (5th Cir. 2014) ....................................... 29
*Norton v. Dimazana,*
    122 F.3d 286 (5th Cir. 1997) ....................................... 24
*Paterson v. Weinberger,*
    644 F.2d 521 (5th Cir. 1981) ................................. 35, 36
*Peoples Nat'l Bank v. Office of the Comptroller of the Currency of the U.S.,*
    362 F.3d 333 (5th Cir. 2004) ....................................... 29
*Porter v. Epps,*
    659 F.3d 440 (5th Cir. 2011) ....................................... 31

*Rhodes v. Chapman,*
    452 U.S. 337 (1981) ........................................................................24

*Richardson v. Tex. Sec'y of State,*
    978 F.3d 220 (5th Cir. 2020).....................................................19, 21

*Seminole Tribe of Fla. v. Florida,*
    517 U.S. 44 (1996) ....................................................................15, 19

*Simon v. Wal-Mart Stores, Inc.,*
    193 F.3d 848 (5th Cir. 1999) .........................................................34

*State v. Loe,*
    692 S.W.3d 215 (Tex. 2024).........................................................23

*Stevenson v. Toce,*
    113 F.4th 494 (5th Cir. 2024) .......................................................25

*Tex. Democratic Party v. Abbott,*
    961 F.3d 389 (5th Cir. 2020) ...................................................27, 29

*United States v. Tanksley,*
    848 F.3d 347 (5th Cir. 2017).........................................................26

*Va. Off. for Prot. & Advoc. v. Stewart,*
    563 U.S. 247 (2011) ......................................................................19

*Ex parte Young,*
    209 U.S. 123 (1908) ...............................................................*passim*

*Zapata v. Smith,*
    437 F.2d 1024 (5th Cir. 1971) .......................................................19

**Statutes:**

U.S. Const. amend:
    VIII ........................................................................................*passim*
    XI...............................................................................................15
    XIV ..........................................................................................3, 9

28 U.S.C.:
    § 1291 ..........................................................................................3
    § 1331..........................................................................................3

Tex. Health & Safety Code § 161.702 ..................................................23

**Other Authorities:**

*Haferkamp* [sic] *v. State*, Nos. 14-94-00829-CR, 14-95-00439-CR, 1996
    WL 283902, at *3 (Tex. App.-Houston [14th Dist.] May 30, 1996,
    no pet.) ....................................................................................6, 7

*Haferkamp* [sic] *v. Stephens*, No. A-13-CA-260-SS, 2013 WL 3777150,
  at *1 (W.D. Tex. July 17, 2013) .............................................................6

## Introduction

David Allen Haverkamp, a 78-year-old Texas inmate, requests a federal-court injunction requiring Texas officials to allow Haverkamp to receive gender-reassignment surgery (GRS), a procedure that would include surgical removal of Haverkamp's penis and testicles, followed by construction of an artificial vagina. The district court correctly ruled that sovereign immunity bars such an extraordinary remedy and that Haverkamp also sued the wrong Defendant—as this Court already held in a prior appeal in this case, *Haverkamp v. Linthicum*, 6 F.4th 662, 671 (5th Cir. 2021) (per curiam) (*Haverkamp I*). This Court should affirm.

Sovereign immunity bars Haverkamp's suit for two independent reasons. First, Haverkamp requests an impermissible remedy under *Ex parte Young*'s narrow exception to sovereign immunity. While *Ex parte Young* might allow federal courts to compel state officials to perform *ministerial* duties, it does not allow them to order state officials exercise *discretion* in particular ways. And the decision whether to allow Haverkamp to receive GRS is certainly discretionary. In *Gibson v. Collier*, 920 F.3d 212, 216 (5th Cir. 2019), this Court held that Texas may ban GRS for inmates—either categorically or on a case-by-case basis—without violating the Eighth Amendment. The Court emphasized that GRS is controversial and that its necessity and efficacy are debated by medical experts. *Id.*

The district court thus correctly determined that the decision whether to allow GRS for Haverkamp is "highly discretionary." ROA.2649. That is especially true given that Haverkamp is nearly 80 years old and has numerous health issues making the decision whether to allow such a "major surgery" even more complex.

ROA.2649. What's more, a prison psychiatrist submitted an affidavit stating not only that GRS isn't medically necessary for Haverkamp but also that Haverkamp *no longer has gender dysphoria*. Although other medical experts might reasonably disagree with that opinion, that's the point. *Ex parte Young* wisely leaves such complicated issues to the discretion of medical experts, not federal courts.

Second, Haverkamp sued improper defendants under *Ex parte Young*, which allows suits against only those state officials who have a particular duty to enforce or implement the challenged law or policy. Here, that means suing state officials responsible for denying GRS to Haverkamp or implementing or enforcing a policy that prohibits it. But neither Dr. Lannette Linthicum nor Dr. Owen Murray—the only Defendants left in this case—has a sufficient connection to implementing or enforcing a policy that denies GRS. Indeed, the relevant gender-dysphoria policy doesn't prohibit GRS at all; it leaves treatment decisions to the discretion of medical personnel. Nor are Dr. Linthicum or Dr. Murray responsible for denying GRS to Haverkamp, as this Court already held as to Dr. Linthicum the first time around in *Haverkamp I*. As for Dr. Murray, the record shows he never treated Haverkamp, reviewed Haverkamp's medical records, or received a GRS recommendation for Haverkamp—much less denied one.

Alternatively, Haverkamp lacks Article III standing. Haverkamp's alleged injury—denial of GRS—isn't traceable to these defendants, who don't promulgate GRS policies, treat Haverkamp, or otherwise dictate Haverkamp's medical care.

Because the district court lacks jurisdiction twice over, the Court should affirm.

# Statement of Jurisdiction

Absent Defendants-Appellees' sovereign immunity and Haverkamp's lack of Article III standing, the district court would have had federal-question jurisdiction under 28 U.S.C. § 1331 over Haverkamp's Fourteenth Amendment claim. This Court has appellate jurisdiction under 28 U.S.C. § 1291 to review the district court's final order dismissing the case for lack of subject-matter jurisdiction.

# Issues Presented

I.   Does sovereign immunity bar Haverkamp's suit requesting an injunction that would compel Texas prison officials to provide GRS to Haverkamp, given that (1) the requested relief intrudes on discretionary medical and penological judgment in violation of the *Ex parte Young* doctrine, and (2) Defendants Dr. Linthicum and Dr. Murray lack a sufficient connection to enforcing any denial of Haverkamp's request for GRS—either specifically as to Haverkamp or more broadly as a general policy?

II.   Alternatively, does Haverkamp lack Article III standing to pursue an equal-protection claim if the alleged injury—denial of GRS—is not fairly traceable to Dr. Linthicum or Dr. Murray, who neither treat Haverkamp nor control Haverkamp's medical care?

## STATEMENT OF THE CASE

### I. Factual Background

#### A. Texas provides for the safety and medical care of inmates diagnosed with gender dysphoria.

The Texas Department of Criminal Justice (TDCJ) is responsible for housing about 129,000 inmates in 98 facilities across the State. ROA.3063. TDCJ contracts with University of Texas Medical Branch (UTMB) and Texas Tech University Health Sciences Center (TTUHSC) to provide Texas inmates with medical and psychiatric services. ROA.3064. UTMB and TTUHSC, in turn, contract with medical professionals to provide medical care to inmates. ROA.3064. Although these medical professionals are not TDCJ employees, TDCJ defers to their judgment regarding medical conditions and treatment. ROA.3064.

Texas's Correctional Managed Healthcare Committee (the Committee) was created by statute and promulgates "general policies that govern medical care for TDCJ inmates." *Haverkamp I*, 6 F.4th at 665. The Committee is composed of a TDCJ employee, UTMB physicians, physicians employed by other medical schools, and physicians appointed by the Governor. *Id.* As relevant here, the Committee promulgated Policy G-51.11, which governs inmate treatment for gender dysphoria. Under the Policy, "treatment is determined on a case-by-case basis as clinically indicated." ROA.3305.

If an inmate discloses transgender identity while in TDCJ custody, TDCJ refers the inmate for medical review and assessment, and determines whether the inmate should be housed with a special population to protect the inmate's health and safety.

ROA.3305. As appropriate, transgender inmates may shower separately, grow long hair, and wear bras. ROA.3065-66. They may also receive hormone therapy. ROA.4658.

Gender-reassignment surgery (GRS),[1] however, is a highly controversial treatment for gender dysphoria. For biological males, GRS involves "removal of the testicles, amputation of the penis, and use of the skin and other tissue to 'construct' labia, a vagina, a clitoris, and other female appearing genitalia."[2] ROA.3748. Rather than "seeking to correct . . . significant anatomic or functional deficits," GRS seeks "to create a more female-appearing anatomy which is more cosmetically desired by the affected individual." ROA.3748-49. GRS is "complicated," "associated with significant medical and surgical risks," and requires "careful follow-up and recovery." ROA.3749-50. Risk factors include a patient's age, weight, Body Mass Index (BMI), and "preexisting conditions such as diabetes, hypertension, hyper-lipidemia, liver and renal function and other co-morbid conditions." ROA.3750.

Under TDCJ policy, GRS is typically considered "elective surgery," and thus it is not generally available, as it is not a covered procedure under the TDCJ health-care plan. ROA.4643, 4658. It isn't banned outright, however. Policy G-51.11 is silent as to GRS, and TDCJ has never interpreted Policy G-51.11 to ban GRS. ROA.3151-

---

[1] Throughout the record and case law, this procedure is called gender-reassignment and sex-reassignment surgery, respectively. Texas adopts Haverkamp's use of the former.

[2] This information is taken from the expert affidavit of Dr. Yaklic, ROA.3747, which the district court cited and on which it relied in ruling that GRS entails "'significant medical and surgical risks,'" ROA.2649.

52, 3160, 3163, 3181, 3194, 3216. Instead, treatment for gender dysphoria is up to the discretion of the relevant medical experts. ROA.3305. There are no constraints, for example, prohibiting a medical provider from recommending GRS as medically necessary for a particular inmate. ROA.3148-49. However, no TDCJ medical expert has ever done so. ROA.3148.

In *Gibson*, 920 F.3d at 228, this Court upheld Policy G-51.11 against constitutional challenge and held that Texas may ban GRS for inmates, either categorically or on a case-by-case basis, without violating the Eighth Amendment. *Gibson* explained that a Texas inmate's "mere disagreement with . . . medical treatment is insufficient to state a claim under the Eighth Amendment." *Id.* at 216 (citation omitted). And because "the necessity and efficacy of sex reassignment surgery is a matter of significant disagreement within the medical community," failure to allow it is not deliberate indifference to medical needs and thus not cruel and unusual punishment. *Id.*

## B. Haverkamp is a 78-year-old biological man who is serving two 45-year sentences for aggravated sexual assault.

In 1994, Plaintiff-Appellant David Haverkamp was convicted of two counts of aggravated sexual assault and sentenced to two 45-years sentences, to be served consecutively. *Haferkamp* [sic] *v. Stephens*, No. A-13-CA-260-SS, 2013 WL 3777150, at *1 (W.D. Tex. July 17, 2013). At trial, Haverkamp's daughter Sharon testified that Haverkamp made her "suck his penis" and then told her "I'm going to show you what it feels like to have a man inside you." *Haferkamp* [sic] *v. State*, Nos. 14-94-00829-CR, 14-95-00439-CR, 1996 WL 283902, at *3 (Tex. App.—Houston [14th

Dist.] May 30, 1996, no pet.) Haverkamp's wife and son separately testified that Haverkamp raped Sharon. *Id.* at *4. The jury also heard evidence that Haverkamp physically and sexually assaulted his wife, *id.* at *4, and that Haverkamp's wife suffered from battered-wife syndrome, *id.* at *5. [3]

Haverkamp has been in TDCJ custody since April 1995. ROA.3062. Haverkamp has an extensive disciplinary record, with more than a dozen violations, including multiple threats to harm other inmates, refusing to obey orders, stealing, trafficking and trading, and possession of contraband. ROA.3063.

Haverkamp is 78 years old and has a BMI of 31, which is within the obesity range. ROA.3763. Haverkamp also has numerous "co-morbid chronic diseases and complicating medical conditions," including diabetes, hypertension, and hypothyroidism. ROA.3763-64.

## C. Nearly 20 years after being sentenced, Haverkamp begins identifying as transgender and receiving oral estrogen as a treatment for gender dysphoria.

Haverkamp didn't begin identifying as transgender or seeking treatment for gender dysphoria until 2013—nearly 20 years after being sentenced—when Haverkamp first "wanted to know about hormone therapy and what benefits/risks

---

[3] This information comes from a direct appeal in which Haverkamp unsuccessfully challenged the admission of this evidence. *Haferkamp* [sic], 1996 WL 283902, at *1. Appellate counsel for Defendants cannot find any other publicly available information about Haverkamp's trial or conviction. This information is included only for context.

would be involved," including whether "surgical reassignment was offered." ROA.3766.

In October 2014, Dr. Walter Meyer, a UTMB psychiatrist and pediatric endocrinologist, evaluated Haverkamp, diagnosed Haverkamp with gender dysphoria, and prescribed Haverkamp estradiol (oral estrogen). ROA.3770. Dr. Meyer treated Haverkamp for the next three years and retired in 2018. ROA.3770.

### D. Haverkamp requests, but does not receive, gender-reassignment surgery.

In October 2015, Haverkamp filed a step-one grievance and requested GRS. ROA.2793-94. Two months later Haverkamp received a response: "You are requesting to know when you can have Gender Reassignment Surgery. You were seen at Hospital Galveston on 12/15/15. You inquired about surgery then but were told you must be on a replacement or higher estrogen for at least one year before surgery can even be considered." ROA.2794. The response is signed by "K. Long." ROA.2794

In January 2016, Haverkamp filed a step-two grievance and demanded GRS: "To settle this: I want a letter saying I will be approved for gender reassignment surgery. Period." ROA.2796. Less than a month later, Haverkamp received a response explaining that "specialists must follow" Policy G-51.11, under which "referrals are based on the clinical findings of the provider at the time of their assessment." ROA.2796. The response explained that Haverkamp does "not have the liberty to dictate what medications, treatments, or appointments will be prescribed," that the "requested remedy is not available through" the grievance

8

process, and that no "further action" was "warranted for this issue at [that] time." ROA.2796. The response is stamp-signed by the "Step II Medical Grievance Program Office of Professional Standards TDCJ Health Services Division." ROA.2796.

In March 2016, Dr. Meyer noted that Haverkamp was "very content with the results of the estradiol" but was still "asking for surgery." ROA.3771. Dr. Meyer reiterated that Haverkamp needed "to stay on a high-dose estradiol for at least a year before we would even *consider*" recommending surgery. ROA.3771 (emphasis added). There is no evidence that he ever recommended GRS or referred Haverkamp for GRS after the one-year period.

In June 2016, Haverkamp was given "safekeeping status," meaning separate housing to protect Haverkamp's health and safety. ROA.3065.

In mid-2018, Dr. Meyer reiterated that Haverkamp was "feeling very well and . . . happy Psychologically everything is great." ROA.3771. Haverkamp had "become a new person," felt "much more like a woman," and liked the "new person she [had] become." ROA.3771. Dr. Meyer retired later that year. ROA.4773.

## II. Procedural History

### A. Haverkamp sues, alleging that the Constitution requires Texas to allow gender-reassignment surgery for inmates.

In 2017, Haverkamp filed a pro se suit in federal court alleging that failure to provide Haverkamp with GRS was cruel and unusual punishment under the Eighth Amendment and an equal-protection violation under the Fourteenth Amendment. *Haverkamp I*, 6 F.4th at 666. Haverkamp sued Dr. Joseph Penn (UTMB psychiatrist)

and Dr. Lannette Linthicum (TDCJ director of health services), and "sought an injunction ordering the defendants to provide Plaintiff with [GRS] and a declaratory judgment affirming Plaintiff's right to necessary treatment and care." *Id.* A magistrate judge held a hearing to determine the proper defendants. *Id.* Counsel for Texas explained that, to the extent Haverkamp was seeking GRS, Dr. Owen Murray was the proper defendant and that, to the extent Haverkamp was seeking a policy change regarding transgender care, members of the Committee were the proper defendants. *Id.* The magistrate judge thus "ordered Haverkamp to file an amended complaint" naming Dr. Murray and the Committee members, including Dr. Linthicum. *Id.*

In the amended pro se complaint, Haverkamp dropped the Eighth Amendment claim due to this Court's holding in *Gibson*. Focusing on the equal-protection claim, Haverkamp claimed to be similarly situated to "cisgendered women with serious medical needs" who receive "medically necessary vaginoplasty." *Id.* at 667. A vaginoplasty for cisgender females is "intended to correct significant anatomic or functional deficits, and return normal function." ROA.3748. It includes repair of vaginal prolapse and hernia. ROA.3748. Because cisgender females may receive these procedures, Haverkamp alleged, Texas cannot deny GRS to Haverkamp without violating equal protection. *Haverkamp I*, 6 F.4th at 667. Haverkamp's amended complaint also referenced Policy G-51.11. *Id.*

As relevant here, the state defendants moved to dismiss, arguing that sovereign immunity stripped the district court of subject-matter jurisdiction. *Id.* at 668. The district court denied the motion, and the state defendants filed an interlocutory

appeal. *Id.* On appeal, this Court vacated the district court's sovereign-immunity ruling and remanded. *Id.* at 672. The Court explained that although Haverkamp alleged

> disagreement between Dr. Meyer and TDCJ concerning the provision of sex-reassignment surgery—even though there is no clear allegation that Dr. Meyer continued to recommend sex-reassignment surgery at the end of the year-long course of hormone therapy—the amended complaint does not allege (1) which TDCJ official, if any, decided that TDCJ would not pay for surgery; (2) whether Dr. Meyer (or anyone else) challenged that decision and brought it before the Committee; or (3) that the Committee adjudicated any dispute between TDCJ and Haverkamp's health care provider concerning sex-reassignment or rendered a decision that aggrieved Haverkamp, perhaps by enforcing Policy G-51.11 so as to deny surgery. Haverkamp has thus failed, at this point, to plausibly allege that the Committee members enforced any policy or were involved in enforcing any decision that Haverkamp challenges.

*Id.* at 670.

As for Dr. Linthicum, the Court explained that Haverkamp's complaint contained "no allegation plausibly linking Linthicum with the challenged decisions," because "in a system with approximately 130,000 inmates in custody, and absent any allegations tying Linthicum to the specific decisions at issue, it cannot be plausibly inferred that Linthicum played any role in the decisions Haverkamp challenges as unconstitutional." *Id.* at 671 (footnote omitted).

Finally, the Court rejected Haverkamp's argument that Texas should be estopped from arguing that Haverkamp sued improper defendants for purposes of sovereign immunity given the State's earlier representations to "the district court as to whom Plaintiff needed to sue depending on the relief sought." *Id.* at 671 n.8. The

Court explained that regardless of what Texas represented to the district court, Haverkamp, as the party asserting federal-court jurisdiction, bore the burden of proof and thus it was "Haverkamp's burden to plead these parties' connection to the enforcement of the decisions Haverkamp challenges." *Id.* at 671. The Court vacated the district court's order and remanded for further proceedings consistent with its opinion. *Id.* at 672. Concurring, Judge Dennis encouraged the district court to appoint counsel on remand. *Id.* (Dennis, J., concurring).

On remand, the district court appointed counsel, and Haverkamp filed the operative second-amended complaint. The operative complaint again brings an equal-protection claim and names the Committee members (including Dr. Linthicum) and Dr. Murray as defendants. ROA.2365-66. Haverkamp again sues Dr. Linthicum in her capacity as director of the TDCJ health-services division and as a member of the Committee. ROA.2367. And Haverkamp again sues Dr. Murray in his capacity as executive director of UTMB's clinical services and chief physician executive, and in his capacity as a member of the Committee's joint medical directors working group. ROA.2367.

Haverkamp alleges that "Dr. Meyer recommended gender reassignment surgery . . . and continued to prescribe increased levels of hormones to Haverkamp as a prerequisite for gender reassignment surgery after twelve months." ROA.2376. Although Haverkamp still does not allege that Dr. Meyer ever actually recommended GRS to Dr. Murray or otherwise referred Haverkamp for GRS after twelve months, Haverkamp alleges that on "information and belief, Dr. Murray was

responsible for denying Dr. Meyers's recommended course of treatment for gender reassignment surgery . . . and continuing to deny such treatment." ROA.2376.

As for Dr. Linthicum, Haverkamp alleges that she was "personally responsible" for the "denial of Haverkamp's grievance seeking medically necessary gender reassignment surgery, after such surgery was recommended to Haverkamp by Dr. Meyer." ROA.2376-77.

On the merits, Haverkamp claims to be "similarly situated to a cisgender female who requires vaginoplasty surgery." ROA.2376. Thus, according to Haverkamp, Defendants "violate equal protection by treating Haverkamp in a dissimilar manner." ROA.2376. Haverkamp also claims that, under the standards articulated by the World Professional Association for Transgender Health (WPATH), GRS is "medically necessary for people with gender dysphoria." ROA.2371.

As to the requested remedy, Haverkamp "seeks an injunction ordering Defendants to provide" Haverkamp with GRS or, in the alternative, "a prospective injunction prohibiting Defendants from implementing Policy G-51.11 in a manner that prohibits gender reassignment surgery." ROA.2378.

Defendants moved to dismiss under Rule 12(b)(1), arguing that the district court lacks subject-matter jurisdiction because sovereign immunity bars Haverkamp's suit (Haverkamp requests an improper remedy and sued improper defendants under *Ex parte Young*) and Haverkamp lacks Article III standing (Haverkamp's alleged injury is not traceable to Defendants). ROA.2506-07. In support of the motion, Defendants submitted an expert affidavit by Eric Guerrero (TDCJ division director), an expert

report by Dr. Penn, a transcript of Dr. Murray's deposition, and Haverkamp's TDCJ grievance record. ROA.2505.

## B. The district court rules that sovereign immunity bars Haverkamp's suit, and Haverkamp appeals.

The district court granted Defendants' motion and dismissed Haverkamp's suit. ROA.2652, 2653. As to Dr. Linthicum, the district court explained that Haverkamp did not specifically allege anything "linking Dr. Linthicum to any adverse, challenged decision regarding Haverkamp's treatment for gender dysphoria." ROA.2646. It then reaffirmed this Court's holding in *Haverkamp I* that "Dr. Linthicum's generalized involvement is insufficient." ROA.2646. The district court also noted that Dr. Linthicum did not investigate or sign Haverkamp's grievances, and thus Haverkamp's allegations are "insufficient to overcome Dr. Linthicum's entitlement to immunity." ROA.2647.

As for Dr. Murray, the district court declined to resolve what it considered to be a factual dispute regarding whether Dr. Murray was a proper defendant. ROA.2649. The district court instead ruled that sovereign immunity barred Haverkamp's requested remedy because "an injunction requiring Dr. Murray or medical providers under his direction to perform [GRS] would impose upon their medical discretion in a manner that *Ex parte Young* prohibits." ROA.2648-49.

The district court made several factual findings in support of its ruling. It noted that Haverkamp is nearly 80 years old, obese, and "has several co-morbid conditions, including diabetes mellitus, hypertension, and hyperlipidemia." ROA.2649. Haverkamp is "at high risk for chronic kidney disease and chronic kidney

failure," factors that "would impact the highly discretionary decision of whether to proceed with a major surgery." ROA.2649. Citing this Court's *Gibson* decision, the district court emphasized that "there is robust and substantial good faith disagreement dividing respected members of the expert medical community about whether [GRS] is medically necessary or beneficial for treating gender dysphoria." ROA.2649.

Because the district court "does not have jurisdiction over Haverkamp's claims against the Defendants," it declined to address Article III standing, and it dismissed the case. ROA.2652.

Haverkamp appealed.[4] ROA.2654

## Summary of the Argument

The district court lacks subject-matter jurisdiction, and this Court should affirm its dismissal of Haverkamp's suit on either of two alternative grounds: sovereign immunity or lack of Article III standing.

**1.** Sovereign immunity, affirmed by the Eleventh Amendment, shields Texas and its officials from federal suits unless an exception applies. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996). The *Ex parte Young* exception permits only prospective injunctive relief involving ministerial duties—it does not allow

---

[4] Haverkamp has abandoned several issues on appeal. Haverkamp appeals only the district court's rulings with respect to Dr. Linthicum and Dr. Murray. *See* Appellant's Br. 12 n.6 ("Ms. Haverkamp does not appeal the dismissal of the committee members"). Haverkamp also didn't appeal the district court's rulings as to other issues, like whether Haverkamp is entitled to makeup and panties. *See Id.* 13 n.7 ("Ms. Haverkamp does not appeal the denial of these items.").

injunctions compelling state officials to exercise discretion in a particular way. And suit must be brought only against state actors with a sufficient enforcement connection to end an alleged ongoing federal law violation. Haverkamp's suit fails on both accounts.

*Improper remedy*. Haverkamp requests an improper remedy under *Ex parte Young*. Haverkamp asks the district court to order Texas officials to perform GRS or enjoin them from interpreting Policy G-51.11 in a way that prohibits it. Both of those requested remedies impermissibly impose on discretionary decisions, not ministerial duties. A ministerial duty requires "precision and certainty" leaving no room for judgment. *Book People, Inc. v. Wong*, 91 F.4th 318, 337-38 (5th Cir. 2024). Providing GRS to Texas inmates is not a ministerial duty. In *Gibson*, 920 F.3d at 225, this Court held that denying GRS to Texas inmates, whether case-by-case or categorically, does not violate the Eighth Amendment because its "necessity and efficacy" are subject to "robust and substantial good faith disagreement" among experts, *id.* at 216, 220. *Gibson* thus confirms that whether to allow GRS is a medical and penological decision left to the discretion of state officials. Here, the decision whether to allow GRS for Haverkamp is particularly complicated. As the district court correctly found, Haverkamp is nearly 80 years old, obese, and has numerous health issues including diabetes and hypertension. ROA.2649. Haverkamp thus faces "significant medical and surgical risks," ROA.2649, making GRS a complex discretionary decision not subject to federal compulsion. Indeed, there is expert testimony in the record indicating not only that GRS isn't medically necessary for Haverkamp but also that Haverkamp no longer has gender dysphoria. ROA.3774. While reasonable

experts might disagree with that opinion, the point is that the issue is complex and subject to good-faith debate—as this Court acknowledged in *Gibson*. Ordering States to perform a dangerous, controversial, and potentially unnecessary medical procedure on an inmate is not the job of federal courts, and *Ex parte Young* prevents them from doing so.

Haverkamp's attempt to reframe an Eighth Amendment claim as an equal-protection claim doesn't fix this problem. Haverkamp claims to be treated differently from cisgender females who receive different procedures—medically necessary reconstruction of damaged vaginas. But for purposes of *Ex parte Young*, what matters is the requested remedy, not the constitutional theory. Whether to allow GRS remains discretionary regardless of Haverkamp's constitutional hook. Nor does Haverkamp's so-called "negative injunction" fare any better. Policy G-51.11 allows medical professionals to treat gender dysphoria on a case-by-case basis. ROA.3305. Compelling state officials to interpret Policy G-51.11 in a particular way imposes on official discretion just as much as requiring them to perform GRS.

*Improper Defendants*. Haverkamp also sued improper defendants under *Ex parte Young*, which requires plaintiffs to sue defendants who have a "particular duty" to enforce the challenged policy. *City of Austin v. Paxton*, 943 F.3d 993, 999 (5th Cir. 2019). Dr. Linthicum, TDCJ's Health Services Director, lacks a specific connection to Haverkamp's care. Indeed, this Court already held that her general oversight of 130,000 inmates is insufficient to make her a proper *Ex parte Young* defendant, *Haverkamp I*, 6 F.4th at 671, and it is "undisputed" that she neither signed nor oversaw Haverkamp's medical grievance, ROA.2646-47. As for Dr. Murray,

17

UTMB's clinical director, he never treated Haverkamp or reviewed Haverkamp's medical records, ROA.3127-28, let alone denied Haverkamp any requested care. Nor are Dr. Linthicum or Dr. Murray tasked with promulgating, changing, or enforcing Policy G-51.11. Haverkamp's "estoppel" argument fails out of the gate because jurisdiction can't be conferred by counsel's statements, *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982), and this Court already rejected an identical argument in *Haverkamp I*, 6 F.4th at 671 n.8.

**2.** Even if sovereign immunity doesn't apply, Haverkamp lacks standing for similar reasons. Article III requires an injury-in-fact that is traceable to the defendants. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Haverkamp's injury—GRS denial—is not traceable to Dr. Linthicum or Dr. Murray, who don't control Haverkamp's medical care. Haverkamp's treating physicians, not these officials, decide treatment, and no policy bans GRS outright.

The Court should affirm.

## Standard of Review

This Court reviews the "district court's jurisdictional determination of sovereign immunity de novo." *City of Austin*, 943 F.3d at 997. It reviews the district court's jurisdictional findings of fact for clear error. *Flores v. Pompeo*, 936 F.3d 273, 276 (5th Cir. 2019).

**ARGUMENT**

## I. Sovereign Immunity Bars Haverkamp's Suit.

Sovereign immunity bars Haverkamp's suit because, under *Ex parte Young*, Haverkamp requests an improper remedy and sued improper defendants.

*Ex parte Young* created a narrow exception to sovereign immunity when a plaintiff requests an appropriate remedy and sues the proper defendants. A proper remedy seeks "only prospective injunctive relief in order to end a continuing violation of federal law." *Seminole Tribe*, 517 U.S. at 73 (cleaned up). That is because "when a federal court commands a state official to do nothing more than *refrain* from violating federal law, he is not the State for sovereign-immunity purposes." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (emphasis added). To the extent federal courts may order state officials to act affirmatively, however, they may do so only "where the officer having some duty to perform *not involving discretion*, but merely *ministerial* in its nature, refuses or neglects to take such action."[5] *Ex parte Young*, 209 U.S. 123, 158 (1908) (emphases added). As this Court has explained, a

---

[5] The Supreme Court has suggested that sovereign immunity bars *any* suit that would require a State to take "affirmative action." *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 691 n.11 (1949). This Court has cited *Larson* footnote 11 favorably, *see Zapata v. Smith*, 437 F.2d 1024, 1026 (5th Cir. 1971), but has ultimately left open the question "whether affirmative injunctions are categorically barred by sovereign immunity," *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 242 (5th Cir. 2020). Defendants take the position that sovereign immunity bars any remedy requiring a State to take affirmative action. But the Court need not resolve that issue here, because sovereign immunity undoubtedly bars a remedy that would require a state official to exercise discretion in a particular way, which is exactly what an injunction requiring Texas officials to allow GRS would do.

19

federal court "may not control" a state officer "in the exercise of his discretion." *Richardson*, 978 F.3d at 242 (cleaned up).

As for the proper defendants, they are state actors who are not only "statutorily tasked with enforcing the challenged law" but also have a "sufficient connection to the enforcement" of the challenged act. *City of Austin*, 943 F.3d at 998 (cleaned up).

Here, Haverkamp requests an improper remedy: an injunction requiring Texas officials to exercise their medical discretion in a particular way by performing, or allowing to be performed, GRS on Haverkamp. GRS is a highly controversial surgery the necessity and efficacy of which is the subject of good-faith debate within the medical community, and thus the district court correctly ruled that whether to perform GRS on Haverkamp—who is nearly 80 years old, has many health issues, and might not even have gender dysphoria—is a discretionary medical decision that a federal court cannot compel without violating sovereign immunity.

Haverkamp also sued improper defendants. To the extent Haverkamp alleges that Policy G-51.11 unconstitutionally prohibits GRS, neither Dr. Linthicum nor Dr. Murray is alleged to have written Policy G-51.11, to have enforcement authority over it, or to have authority to change it. Nor has Haverkamp sufficiently alleged that Dr. Linthicum or Dr. Murray is responsible for the decision to deny GRS to Haverkamp. Haverkamp doesn't allege that either Dr. Linthicum or Dr. Murray is or was Haverkamp's treating physician or has ever even examined Haverkamp to determine whether GRS is clinically indicated or medically necessary for Haverkamp. Nor does Haverkamp allege that either Dr. Linthicum or Dr. Murray has authority to control how other physicians treat Haverkamp.

### A. Haverkamp requests an improper remedy under *Ex parte Young*.

The district court correctly ruled that an injunction requiring state officials to allow GRS for Haverkamp would "impose upon their medical discretion in a manner that *Ex parte Young* prohibits." ROA.2649.

A state official has a ministerial duty to act if "the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Book People*, 91 F.4th at 338 (citation omitted). A state official exercises discretionary functions, however, when "a statute, regulation, or policy leaves it to" the official "to determine when and how to take action." *Richardson*, 978 F.3d at 242 (cleaned up). In other words, if a state law, regulation, or policy "fails to specify the *precise action* that the official *must take* in each instance," then it "creates only discretionary authority; and that authority remains discretionary however egregiously it is abused." *Davis v. Scherer*, 468 U.S. 183, 196 n.14 (1984) (emphases added).

Here, no law or policy requires state officials to allow GRS for Texas inmates. In fact, this Court has held that denying GRS to Texas inmates—either on a case-by-case basis or as a blanket policy—isn't deliberate indifference to a serious medical need and thus doesn't violate the Eighth Amendment. *Gibson*, 920 F.3d at 216. Like Haverkamp, Gibson was a Texas inmate housed in TDCJ who sought GRS. *Id.* Also like Haverkamp, Gibson argued that the WPATH Standards of Care establish that GRS is medically necessary. *Id.* at 216, 221. This Court disagreed and, echoing the First Circuit in *Kosilek v. Spencer*, 774 F.3d 63, 96 (1st Cir. 2014), concluded that the WPATH standards "reflect not consensus, but merely one side in a sharply

contested medical debate over sex reassignment surgery." *Gibson*, 920 F.3d at 221.
*Gibson* reaffirmed that the Constitution does not require state prisons to "provide
whatever care an inmate wants." *Id.* at 216. As for GRS, the Court noted that its
"necessity and efficacy . . . is a matter of significant disagreement within the medical
community." *Id.* at 216. Thus, denying GRS to inmates is not "intentional or wanton
deprivation of care." *Id.* at 220.

Under *Gibson*, Texas officials don't have a ministerial duty to allow Texas
inmates to undergo GRS. The district court thus correctly ruled that the decision
whether to perform a "major surgery" on Haverkamp is a "highly discretionary
decision" that can't be compelled without violating sovereign immunity. ROA.2649.
The district court was particularly concerned about the unique risks of performing
GRS on Haverkamp, who is nearly 80 years old, "stands 5 feel 11 inches, weighs 222
pounds, and has a BMI of 31, which is within obesity range." ROA.2649. In addition,
Haverkamp "has several co-morbid conditions, including diabetes mellitus,
hypertension, and hyperlipidemia," and is "at high risk for chronic kidney disease
and chronic kidney failure." ROA.2649.

These jurisdictional factual findings must be upheld unless clearly erroneous—
that is, unless this Court is "left with the definite and firm conviction that a mistake
has been committed." *Flores*, 936 F.3d at 276 (citation omitted). And while
Haverkamp disagrees with how the district court "plucked out" certain facts about
Haverkamp's health and "made no mention" of other "testimony addressing those
factors," Appellant's Br. 39, Haverkamp doesn't argue that the district court's
jurisdictional findings were clearly erroneous. Instead, Haverkamp argues (at 36, 40)

that the district court conducted an impermissible merits analysis. But the district court's analysis has nothing to do with the merits of Haverkamp's equal-protection claim. The district court didn't consider whether a challenged policy creates a classification, whether there's discriminatory intent or impact, what level of scrutiny applies, or whether Texas has a justification for any such classification. Instead, the district court properly limited its analysis to a *jurisdictional* question—whether it may compel Texas officials to perform a particular medical procedure (GRS) on a particular inmate (Haverkamp). The district court correctly determined that it does not.

That makes sense. Under basic principles of federalism, Texas, like all States, has "great latitude under [its] police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (citation omitted). Thus, decisions regarding medical care and medical practice are at the core of a State's power to "provide for the general welfare of its people."[6] *Dent v. West Virginia*, 129 U.S. 114, 122 (1889).

Like medical care, the management of state prisons is a core state responsibility. The Supreme Court has long recognized that state prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and

---

[6] In 2023, for example, the Texas Legislature banned GRS for anyone under the age of 18. *See* Tex. Health & Safety Code § 161.702. Last year, the Texas Supreme Court upheld that decision against constitutional challenge. *State v. Loe*, 692 S.W.3d 215 (Tex. 2024). According to the court, treatments like GRS are "relatively new" ways of addressing a "relatively newly defined medical condition." *Id.* at 231.

practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Absent conditions that inflict "unnecessary or wanton pain" or are "grossly disproportionate to the severity of crimes warranting imprisonment," decisions regarding the safe and appropriate operation of state prisons "properly are weighed by the legislature and prison administration rather than a court." *Rhodes v. Chapman*, 452 U.S. 337, 348-49 (1981). Prison officials aren't required to provide an "ideal environment for long-term confinement" or even an environment "free of discomfort." *Id.*

Thus, States are afforded especially wide deference when making discretionary decisions regarding the medical care of state inmates. Of course, discretion has its limits: state officials cannot act with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). It is "only such indifference," however, that constitutes cruel and usual punishment and thus violates the Eighth Amendment. *Id.* Mere "[d]isagreement with medical treatment" does not constitute deliberate indifference. *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). And even negligent treatment isn't actionable under the Eighth Amendment. *Estelle*, 429 U.S. at 106.

Because *Gibson* held that prohibiting GRS for inmates doesn't violate the Eighth Amendment, however, whether to provide it to inmates is a discretionary decision that a federal court cannot compel under *Ex parte Young*. The competing medical testimony in this case exemplifies why an injunction requiring Texas to allow GRS for Haverkamp would be inappropriate. For example, Dr. Penn submitted an

affidavit opining not only that GRS isn't medically necessary for Haverkamp but also that Haverkamp no longer has gender dysphoria. ROA.3774. While other medical officials might disagree with that opinion, the opinion itself is evidence that the decision whether to allow Haverkamp to receive GRS is complicated and subject to good-faith debate, making it discretionary. It also raises the possibility that Haverkamp's requested injunction would require Texas to allow GRS as a treatment for a condition that Haverkamp no longer has. Sovereign immunity prevents federal courts from weighing in on such complicated medical decisions.

Haverkamp responds by relying (at 41, 43, 45, 50) on a different, pre-*Gibson* Eighth Amendment case: *Delaughter v. Woodall*, 909 F.3d 130 (5th Cir. 2018). *Delaughter* held that a state inmate could seek injunctive relief requiring the defendants to provide "required hip surgery." *Id.* at 137. Haverkamp argues (at 41) that *Delaughter* is "dispositive" because, under it, courts may permissibly issue injunctions requiring "constitutionally mandated medical care."

The problem for Haverkamp is that *Gibson* was decided after *Delaughter* and, unlike *Delaughter*, held that the relevant medical procedure (GRS) was not required by the Eighth Amendment. So to the extent *Delaughter* held that States have a ministerial duty to provide inmates with medical care required by the Eighth Amendment, that is irrelevant because, under *Gibson*, GRS is not required by the Eighth Amendment. Nor did *Delaughter* or *Gibson* hold or imply that *Ex parte Young* may be used to compel discretionary medical decisions under different constitutional theories.

The other Fifth Circuit cases cited by Haverkamp are unhelpful for the same reason: they involve denial of medical procedures required by the Eighth Amendment. *See Stevenson v. Toce*, 113 F.4th 494 (5th Cir. 2024) (ankle repair); *Miles v. Rich*, 576 F. App'x 394, 395 (5th Cir. 2014) (per curiam) (knee surgery).

Haverkamp also cites *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019) (per curiam), but that case simply decided the Eighth Amendment issue differently and thus created a circuit split by becoming "the first federal court of appeals to mandate that a State pay for and provide sex-reassignment surgery to a prisoner under the Eighth Amendment." *Edmo v. Corizon, Inc.*, 949 F.3d 489, 490 (9th Cir. 2020). Eight judges joined Judge O'Scannlain's dissent from denial of rehearing en banc. *Id.* In any event, in *this* Circuit, banning GRS for state inmates does not violate the Eighth Amendment. No Supreme Court decision has overruled *Gibson*, and thus *Gibson* binds this Court. *United States v. Tanksley*, 848 F.3d 347, 350 (5th Cir. 2017).

Haverkamp's other citation are unhelpful. *See Cordellioné v. Commissioner, Indiana Department of Correction*, No. 3:23-CV-135, 2024 WL 4333152 (S.D. Ind. Sept. 17, 2024); *Clark v. Quiros*, No. 3:19-CV- 575, 2024 WL 3552472 (D. Conn. July 26, 2024). These are district-court cases from different circuits, and thus they are nonbinding twice over. *Cordellioné* is also pending on appeal before the Seventh Circuit, which (unlike this Circuit) has not yet addressed whether the Eighth Amendment requires providing GRS for inmates. *Clark* is from the Second Circuit (which hasn't decided the Eighth Amendment issue either) and wasn't appealed.

Nor does it matter that, in light of *Gibson*, Haverkamp is trying to reframe an Eighth Amendment claim as an equal-protection claim. That actually creates more remedy problems.

An equal-protection "remedy must provide equal treatment." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 416 (5th Cir. 2020) (Ho, J., concurring). Thus, a court can either extend "the benefits or burdens to the exempted class" or it can prohibit "the benefits or burdens for all." *Barr v. Am. Ass'n of Political Consultants, Inc*, 591 U.S. 610, 632 (2020) (Kavanaugh, J., writing for plurality). In other words, a State can remedy an alleged equal-protection violation by "leveling up" or "leveling down." *Tex. Democratic Party*, 961 F.3d at 417 (Ho, J., concurring).

To level up, the district court would have to require Texas officials to provide GRS to Haverkamp. As discussed, that remedy is barred by *Ex parte Young* because whether to allow GRS for inmates is a discretionary decision, not a ministerial duty. The Equal Protection Clause doesn't override jurisdictional bars.

To level down, the district court would have to prohibit Texas officials from allowing biological females to receive medically necessary reconstructive vaginoplasty.[7] Haverkamp doesn't even request that remedy, likely because it wouldn't remedy the alleged injury (denial of GRS to Haverkamp) and also because prohibiting Texas officials from providing medically necessary surgery to biological

---

[7] Haverkamp seems to claim for the first time on appeal (at 21, 35) to be similarly situated to a cisgender female inmate who received reconstructive breast surgery after double mastectomy. Even if that constitutional theory is plausible—it isn't—it is waived.

females would violate the Eighth Amendment. Haverkamp's silence on this option underscores that the novel equal-protection theory doesn't fix the remedy problem.

Reframing the scope of the requested injunction doesn't fix the remedy problem either. Haverkamp now claims for the first time (at 51) to be seeking a "negative injunction in the alternative," which would enjoin Defendants "from promulgating a categorical ban that treats her differently from other women on the basis of her transgender identity." There are at least four problems with this argument. *First*, the request is waived because it isn't the remedy Haverkamp sought in the operative complaint: "an injunction ordering Defendants to provide her with gender reassignment surgery," ROA.2378 ¶ 57, or "a prospective injunction prohibiting Defendants from implementing Policy G-51-11 in a manner that prohibits gender reassignment surgery," ROA.2378 ¶ 58. *Second*, it has the same "levelling" and "levelling down" problem. An injunction remedying Haverkamp's perceived dissimilar treatment would be barred by sovereign immunity if it required allowing GRS for Haverkamp and the Eighth Amendment if it required prohibiting medically necessary procedures for other inmates. *Third*, the remedy is incoherent. Categorical bans are just that—categorical—and thus they don't treat some inmates different from others. *Fourth* and relatedly, Haverkamp hasn't alleged or argued that GRS is categorically banned for only certain groups of people—biological males, for example. Instead, Haverkamp claims to be similarly situated to inmates of a different gender and biological sex (cisgender females) who receive different medical procedures (reconstructive vaginoplasty). In any event, regardless of the merits of Haverkamp's equal-protection theory, there is no conceivable injunction that would

28

remedy Haverkamp's injury without violating sovereign immunity, the Constitution, or both.

## B. Haverkamp sued improper defendants under *Ex Parte Young*.

Sovereign immunity bars this suit for a second, independent reason: Haverkamp sued the wrong defendants under *Ex parte Young*.

Haverkamp is the "party claiming federal subject matter jurisdiction" and thus has "the burden of proving it exists." *Peoples Nat'l Bank v. Office of the Comptroller of the Currency of the U.S.*, 362 F.3d 333, 336 (5th Cir. 2004). That means Haverkamp bears the burden of naming "the proper defendant or defendants" for purposes of the *Ex parte Young* exception to sovereign immunity. *City of Austin*, 943 F.3d at 998.

Under *Ex parte Young*, proper defendants are those who are "clothed with some duty in regard to the enforcement of" the law or policy at issue. 209 U.S. at 156. A general duty to ensure that state laws are followed is not enough; the defendants must have a "particular duty to *enforce*" or implement the challenged law. *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (emphasis added). If the defendant "is not statutorily tasked with enforcing the challenged law," "then the requisite connection is absent" and the Court's "*Young* analysis ends." *Abbott*, 961 F.3d at 401 (citation omitted).

Here, even assuming Haverkamp has sufficiently alleged some kind of informal policy of GRS denial, Haverkamp has not sufficiently alleged or shown that Dr. Linthicum or Dr. Murray has the authority or duty to enforce such a policy, or that either was responsible for denying GRS to Haverkamp.

**1.** In *Haverkamp I* this Court held that Dr. Linthicum is an improper *Ex parte Young* defendant. That remains true.

To the extent Haverkamp sues Dr. Linthicum in her capacity as TDCJ's Director of Health Services, Haverkamp does not allege that Dr. Linthicum has any personal connection to Haverkamp's medical care or authority to tell UTMB physicians how to exercise their medical judgment. Instead, Haverkamp alleges that Dr. Linthicum is generally "responsible for ensuring that TDCJ health care policies, directives, and protocols are properly implemented at all facilities and for updating and creating administrative directives, clinic, and health guidelines, including those that relate to care for gender dysphoria." ROA.2367 ¶ 9. But as this Court held in *Haverkamp I*, Dr. Linthicum's general involvement in prison health-care policies is insufficient: "in a system with approximately 130,000 inmates in custody, and absent any allegations tying Linthicum to the specific decisions at issue, it cannot be plausibly inferred that Linthicum played any role in the decisions Haverkamp challenges as unconstitutional." 6 F.4th at 671 (footnote omitted). The district court properly relied on that holding in determining that Haverkamp continues to fail to "include specific allegations linking Dr. Linthicum to any adverse, challenged decision regarding Haverkamp's treatment for gender dysphoria." ROA.2646.

To the extent Haverkamp sues Dr. Linthicum in her capacity as former Executive Director of the Committee, Haverkamp admits that the Executive Director role has not existed since June 2020, when the Committee amended its policy to remove it. ROA.2369-70. Thus, regardless of the authority Dr. Linthicum may have had in her role as a Committee member in the past, she has no such

authority now. That is crucial because proper *Ex parte Young* defendants must be "*currently* violating federal law," *Williams ex rel J.E. v. Reeves*, 954 F.3d 729, 737 (5th Cir. 2020), in their capacity as state officials who *currently* "possess authority to enforce" the challenged policy, *Haverkamp I*, 6 F.4th at 670 (citation omitted).

Finally, to the extent Haverkamp sues Dr. Linthicum for her supposed role in overseeing the response to Haverkamp's step-two grievance, ROA.2376-77 ¶ 45, there is no evidence that she had such a role. The district court correctly found as a factual matter that it is "undisputed that the grievance was investigated by an administrative assistant, who provided a report with a suggested response to Dale Dorman." ROA.2647. There is no evidence that Dr. Linthicum signed, rejected, or even read the grievance. Nor does the fact that Dr. Linthicum serves as Director of Health Services link her to any particular grievance response drafted by her subordinates.[8]

**2.** Dr. Murray is an improper *Ex parte Young* defendant too.

The parties briefed this issue before the district court, but the district court didn't decide it. ROA.2648. The Court may still affirm on this ground because Dr. Murray is an improper *Ex parte Young* defendant as a matter of law, and the Court may affirm on any ground supported by the record. *Kovac v. Wray*, 109 F.4th 331, 335 (5th Cir. 2024). If the Court determines that factual issues remain, however, then it should "remand to the district court for a factual finding on this issue in the first

---

[8] Even if it did, Dr. Linthicum cannot be held liable under a *respondeat superior* theory, because there is no vicarious liability under section 1983. *E.g.*, *Porter v. Epps*, 659 F.3d 440, 444 (5th Cir. 2011).

instance." *Gross v. GGNSC Southaven, L.L.C.*, 817 F.3d 169, 180 (5th Cir. 2016). Haverkamp agrees with the latter approach. Appellant's Br. 26, 32-33.

Haverkamp doesn't allege that Dr. Murray has a duty to enforce Policy G-51.11 or any other formal or informal law or policy prohibiting GRS. Nor has Murray ever treated Haverkamp. Indeed, Murray hasn't even read Haverkamp's medical records. ROA.3127-28 (23:22-24:2). Haverkamp nonetheless alleges that, "[o]n information and belief, Dr. Murray was responsible for denying Dr. Meyers's recommended course of treatment for" GRS "after March 8, 2016 and continuing to deny such treatment." ROA.2376 ¶ 43. But there is no evidence that Dr. Meyer ever determined that GRS was clinically indicated or medically necessary for Haverkamp. There is no evidence that Dr. Meyer ever recommended GRS when he was Haverkamp's treating physician. Dr. Meyer did note that Haverkamp must take estradiol "for at least one year" before GRS could "even [be] considered." ROA.2392. But there is no evidence that Dr. Meyer ever *did* consider or recommend GRS at the end of the one-year period—his contemporaneous notes, for example, indicate that Haverkamp was "feeling very well and . . . happy" when Dr. Meyer retired in 2018. ROA.3261. If Dr. Meyer thought Haverkamp needed GRS, he could have initiated a surgical referral or discussed the recommendation with UTMB leadership. He didn't. ROA.3148-49 (44:18-45:2), 3158 (54:8-12), 3160 (56:13-56:16). Dr. Murray testified that no gender-dysphoria specialist ever "recommended gender reassignment surgery as a treatment for Haverkamp." ROA.3159 (55:22-55:25). Because neither Dr. Meyer nor any other doctor ever recommended that Haverkamp

receive GRS, there was no law, policy, or decision for Dr. Murray to enforce or override.

Haverkamp points to an affidavit Dr. Meyer submitted for this litigation, after his retirement and five years after he stopped treating Haverkamp, ROA.4228, in which he claimed that Dr. Murray told him that GRS is prohibited. ROA.4254-55. But Dr. Meyer never claimed that Dr. Murray was responsible for creating, changing, or enforcing that policy, or that Dr. Murray was ever involved in denying GRS to Haverkamp or aware of any medical decisions involving Haverkamp. Thus, Dr. Meyer's affidavit doesn't create a factual dispute because it doesn't establish that the denial of GRS *to Haverkamp* is attributable to Dr. Murray. Because Dr. Murray is an improper *Ex parte Young* defendant as a matter of law, the Court may affirm on that basis.

Haverkamp argues incorrectly (at 26-30) that Defendants are estopped from arguing that Dr. Murray is an improper *Ex parte Young* defendant.

Judicial estoppel requires a statement made by an attorney "before the court." *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003). Here, Haverkamp relies primarily on a private email in which trial counsel for the state defendants told counsel for Haverkamp that the named defendants "would have the power to ensure that the terms of [an] injunction were satisfied." Appellant's Br. 15, 29. That is not a statement before a court, and thus judicial estoppel does not apply to the email.

Haverkamp also relies (at 27-28) on a supposedly contrary position taken by Defendants' trial counsel before a magistrate judge several years ago, before this Court's *Haverkamp I* decision. But this Court already rejected that argument in

*Haverkamp I*. There, Haverkamp argued that this Court should "apply judicial estoppel to preclude Texas from now asserting that Plaintiff has sued the wrong defendants after the State expressly advised the district court as to whom Plaintiff needed to sue depending on the relief sought." *Haverkamp I*, 6 F.4th at 671 n.8. The Court disagreed, because although "Texas did identify Defendants as the proper parties to sue if Haverkamp seeks to change Policy G-51.11 or to receive surgery, this is different from representing that the allegations in Haverkamp's operative complaint sufficiently allege that Defendants enforced the policy such that the *Ex Parte Young* doctrine can be properly invoked in order to overcome sovereign immunity." *Id.* Thus, even if Texas had "identified the parties Haverkamp should sue," it would remain "Haverkamp's burden to plead these parties' connection to the enforcement of the decisions Haverkamp challenges." *Id.* at 671.

The same is true here. No "action of the parties can confer subject-matter jurisdiction upon a federal court," and thus "the consent of the parties is irrelevant" and "principles of estoppel do not apply" to subject-matter jurisdiction. *Ins. Corp. of Ireland*, 456 U.S. at 702; *see also Simon v. Wal-Mart Stores, Inc.*, 193 F.3d 848, 850 (5th Cir. 1999) (same). Counsel's statements can't bind the parties or a court to some kind of jurisdictional concession, and thus estoppel doesn't apply.

## II. Haverkamp Lacks Article III Standing.

Although Defendants raised Article III standing before the district court, ROA.2514-15, the district court didn't reach the issue. If the Court determines that sovereign immunity doesn't bar Haverkamp's suit, however, then it should hold that Haverkamp lacks standing to bring it.

To have Article III standing, a plaintiff must allege: (1) an injury-in-fact that is (2) fairly traceable to the defendant's challenged action and (3) redressable by a favorable outcome. *Clapper*, 568 U.S. at 409. Traceability is lacking where the alleged injury is "the result of the independent action of some third party not before the court." *In re Deepwater Horizon*, 732 F.3d 326, 340 (5th Cir. 2013) (internal quotation marks omitted). Importantly, when evidence is introduced to challenge the jurisdictional facts, the plaintiff bears the burden of proving jurisdiction by a preponderance of the evidence. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

Here, Haverkamp lacks Article III standing because Haverkamp's alleged injury, denial of GRS, is not traceable to Dr. Linthicum or Dr. Murray. Haverkamp has not submitted any evidence establishing that the denial of GRS is traceable to Dr. Linthicum. There's no evidence that Dr. Linthicum was aware of Haverkamp's requests for GRS, much less that Dr. Linthicum denied the grievances herself—they weren't signed by Dr. Linthicum—or otherwise caused Haverkamp to be denied GRS.

Nor has Haverkamp established by a preponderance of evidence that Dr. Murray is responsible for the denial of GRS. Haverkamp alleges that, "[o]n information and belief, Dr. Murray was responsible for denying Dr. Meyers's recommended course of treatment for" GRS, ROA.2376 ¶ 43, but that is insufficient given the jurisdictional evidence submitted by Defendants' in support of their 12(b)(1) motion. Dr. Murray testified that he never treated Haverkamp or even read Haverkamp's medical records. ROA.3127 (23:22-24:2). He also testified that no gender-dysphoria

35

specialist has ever "recommended gender reassignment surgery as a treatment for Haverkamp." ROA.3159 (55:22-55:25).

Haverkamp also points (at 17) to evidence that Dr. Murray told Dr. Meyer that that GRS is not allowed for inmates, but Haverkamp offers no evidence that Dr. Murray denied *Haverkamp's* request for GRS and thus caused *Haverkamp's* injury. Dr. Meyer never said that Dr. Murray denied a request or referral for GRS or was even aware that Dr. Meyer recommended GRS for Haverkamp. As the party asserting jurisdiction against a factual attack, Haverkamp bears the burden of proving that jurisdiction exists by a preponderance of the evidence. *Paterson*, 644 F.2d at 523. Haverkamp failed to meet that burden here.

## CONCLUSION

The Court should affirm.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

AARON L. NIELSON
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

/s/ Cameron Fraser
CAMERON FRASER
Assistant Solicitor General
Cameron.Fraser@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

ERIC S. ABELS
Assistant Attorney General

*Counsel for Defendants-Appellees*

## CERTIFICATE OF SERVICE

On April 7, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Cameron Fraser
CAMERON FRASER

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,083 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Cameron Fraser
CAMERON FRASER